1  Rachel Steinback, SBN 310700
2  LAW OFFICE OF RACHEL STEINBACK
   P.O. Box 291253
3  Los Angeles, CA 90029
4  (t) 213-537-5370
   (f) 213-232-4003
5  (e) steinbacklaw@gmail.com

6  *Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTONY JACKSON and TOYA JACKSON, individually and on behalf of their minor child, T.J., <br><br> Plaintiffs, <br> v. <br><br> CITY OF LOS ANGELES, and Los Angeles Police Department DOES 1-20, <br><br> Defendants. | Case No. 19-CV-2254 <br><br> COMPLAINT FOR DAMAGES <br><br> 1. Violation of Civil Rights (42 U.S.C. § 1983 – Excessive Force) <br> 2. Violation of Civil Rights (42 U.S.C. § 1983 – Unlawful Seizure) <br> 3. Violation of Civil Rights (42 U.S.C. § 1983 – Unlawful Entry) <br> 4. Violation of Civil Rights (42 U.S.C. § 1983 – Failure to Intervene) <br> 5. *Monell* Claim (42 U.S.C. § 1983) <br> 6. Assault <br> 7. False Imprisonment <br> 8. Intentional Infliction of Emotional Distress <br> 9. Negligence <br> 10. Bane Act (Cal. Civil Code § 52.1) <br><br> **DEMAND FOR JURY TRIAL** |

1

COMPLAINT

## INTRODUCTION

1. Mr. Antony Jackson, Dr. Toya Jackson, and their two children live in a single-family home on a quiet residential street in Los Angeles. The Jacksons have resided there for more than ten years and decided to settle down there because of its proximity to the girls' school and because it is less than ten minutes away from the veterinary hospital Mr. and Dr. Jackson own and operate.

2. On the night of December 23, 2017, Mr. Jackson, Dr. Jackson, and their 10-year old daughter T.J. were in their home, getting ready to enjoy the Christmas holiday together as a family. They had already eaten dinner and were in their pajamas. Mr. Jackson and Dr. Jackson settled into their living room to watch a movie, and T.J. went to the den in the back of their home to watch her own movie.

3. Suddenly, T.J. heard loud banging in the back yard. Thinking her home was being invaded, she immediately ran to the front of the house where her parents were, terrified and screaming.

4. At the same moment, Mr. and Dr. Jackson saw a light shine through their living room windows. Not a second later, they heard Los Angeles Police Department officers ordering them to exit their home with their hands on their head.

5. The Jacksons had no idea what was going on, and they were terrified. They are law-abiding citizens and had never had any interactions with the police.

6. Mr. and Dr. Jackson are African-American. They are acutely aware of the potential dangers that Black civilians face in police interactions, even when those citizens have done nothing wrong and even when they are (as Mr. and Dr. Jackson are) highly educated professionals. As Dr. Jackson and T.J. cowered on the kitchen floor, screaming and crying, Mr. Jackson walked out of his home, barefoot and in pajamas, hands above his head. On and around his property stood

a veritable army of Los Angeles Police Department officers, guns drawn and aimed directly at him.

7. Mr. Jackson was fully compliant and did everything in his power to defuse the chaotic and terrifying situation. He told the officers that there must have been a mistake, that he had neither called the police nor done anything wrong, and that he owned the home they were surrounding.

8. In fact, the LAPD officers <u>were</u> in error: they were responding to an in-progress robbery call, but they drove to the wrong address. This should have been obvious to them from the moment of their arrival, and not just because the Jackson family's home address was clearly marked in multiple places that would have been visible and obvious to the LAPD officers.

9. Nevertheless, they continued to hold a terrified Mr. Jackson at gunpoint, with his wife and daughter audibly screaming and crying in the background. After what felt like ages, the LAPD Officers finally left the Jacksons' property without so much as an apology.

10. Mr. Jackson made several attempts to find out what had happened and to get an apology for the significant distress he and his wife and daughter had suffered. Those attempts were unsuccessful. He was initially told that the LAPD had no record of having been at his home. After several months of visiting and calling his local Pacific Division police station, he was finally informed that evidence of the incident had been reviewed and that the LAPD concluded there had been no wrongdoing by any of its officers.

11. The Jacksons bring this lawsuit to get justice for what happened to them, and to help ensure that no other family is forced to endure the terror they experienced.

## JURISDICTION AND VENUE

12. This is an action for damages pursuant to 42 U.S.C. § 1983 and based upon the violations of Plaintiffs' rights under the Fourth and Fourteenth

Amendments to the United States Constitution and California law. Jurisdiction exists pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as they arise from the same case or controversy as Plaintiffs' federal claims.

13. Venue is proper in the Central District of California as the events and conduct complained of herein all occurred in the Central District.

## PARTIES

14. Plaintiff Antony Jackson ("Mr. Jackson") is an African-American resident of Los Angeles. He obtained his law degree in 1990 and received a Master of Public Health from Morehouse School of Medicine in 1997. He and his wife, Plaintiff Toya Jackson, own the home where they reside. They also own and operate Airport Cities Animal Hospital, Inc., a veterinary hospital in nearby Inglewood. Mr. Jackson is the Chief Financial Officer and Administrator of Airport Cities Animal Hospital.

15. Plaintiff Toya Jackson ("Dr. Jackson") is an African-American resident of Los Angeles. She received a Bachelor of Science from the University of California, Davis and a Doctor of Veterinary Medicine from Tuskegee University. She is the President and Chief Executive Officer of Airport Cities Animal Hospital, Inc. She and her husband, Plaintiff Antony Jackson, own the home where they reside with their two young daughters, which is where the incident giving rise to this lawsuit occurred.

16. Plaintiffs Mr. and Dr. Jackson bring this action on their own behalf and as parents of their minor daughter, T.J.

17. Plaintiff T.J. is a minor and a resident of Los Angeles.

18. Defendant City of Los Angeles (hereinafter, "City") is a municipality duly organized under the laws of the State of California. Liability under California law for Defendant City is based in whole or in part upon California Government Code § 815.2, Penal Code § 240, and/or Civil Code §§ 43, 51, 51.7, and/or 52.1.

19. Defendants DOES 1-20 are individual Los Angeles Police Department officers, agents and/or employees who were employed by Defendant City of Los Angeles and acting under color of state law at all times relevant to this Complaint. The true names and capacities of DOES 1 through 20 are presently unknown to Plaintiffs, and on this basis, Plaintiffs sue these Defendants by fictitious names. Plaintiffs will amend the Complaint to substitute the true names and capacities of the DOE Defendants in accordance with California Code of Civil Procedure § 484. Plaintiffs allege that each of the DOE Defendants are responsible in some manner for the occurrences hereinafter alleged, and that such conduct caused the injuries Plaintiffs complain of herein.

## FACTUAL ALLEGATIONS

20. On the night of December 23, 2017, Mr. Antony Jackson, Dr. Toya Jackson, and their 10-year old daughter T.J. (collectively, "Plaintiffs") were in their home, relaxing and readying to enjoy the Christmas holiday together as a family.

21. They had already eaten dinner and all of them were in their pajamas.

22. T.J. had settled into the den in the back of their home to watch a movie and her parents, Mr. and Dr. Jackson, were relaxing in the living room in the front of the house, watching another movie.

23. The den had large windows that looked out to the back yard. The living room had large windows that looked out to the front and side yards. None of the windows had their shades or coverings drawn. Anyone standing outside that night would easily have been able to see into the rooms where Plaintiffs were seated, relaxing, watching TV in their pajamas.

24. Shortly after settling into the living room, Mr. and Dr. Jackson noticed a bright light shine through one of the windows that looked out to the side yard.

25. A moment later, ten-year-old T.J., alone in the back den, heard shouting and banging coming from the back yard, as though someone was breaking

through their gate. She also saw flashlights beaming light on the yard. Terrified and thinking that their home was being attacked, T.J. immediately ran screaming to her parents in the front of the home.

26. As T.J. ran toward the living room, Plaintiffs heard a booming order, as though on a megaphone: Los Angeles Police Department ("LAPD") officers were ordering them to exit the house with their hands on their head.

27. Plaintiffs are African-American. They are acutely aware of the potential dangers that Black civilians face in police interactions, even when those citizens have done nothing wrong and even when they are (as Mr. and Dr. Jackson are) highly educated professionals.

28. When the LAPD yelled for them to come out with their hands up, Dr. Jackson began begging her husband not to go outside. Although neither she nor Mr. Jackson had done anything wrong, she feared that he, a Black man, might be harmed if he went out to greet the police – or worse.

29. Mr. Jackson told her and their terrified child to go into the kitchen and get on the floor while he approached the front door. Dr. Jackson and T.J. did so, screaming and crying, begging him not to go to the door.

30. Mr. Jackson approached the door – which has a window at the top – with his hands up, so that everyone out front could see that he was complying with their orders. He also, as loudly as possible, announced every action that he was taking: he informed the LAPD officers that he was approaching the front door with his hands up; he informed them that when he opened the door, they were going to hear a loud beeping, which was simply the security alarm on the house alerting; he told them that they might see someone in the background, but that would just be his wife, deactivating the security alarm; and he stated that he would exit the home with hands up.

31. When he opened the door, he saw approximately fifteen LAPD officers (DOES 1-15) on his property surrounding the home, guns drawn and aimed at him.

32. Mr. Jackson was barefoot and wearing his pajamas when he walked out his front door.

33. With his hands above his head, Mr. Jackson told the officers that the house was his and his wife's. He told the officers that there was nothing wrong, and that no one had called the police to their home.

34. Dr. Jackson and T.J. continued to sob hysterically in the kitchen, where they laid on the floor, in fear for Mr. Jackson's life and for their own lives.

35. On information and belief, the LAPD had received a burglary-in-progress call for a home at a *different* address on a *different* street in the Jacksons' neighborhood.

36. DOES 1-15's error would have been immediately obvious to them for at least three independent reasons: (i) Mr. and Dr. Jackson's street address – 7926 Kentwood Avenue – was visible on their home, where a large sign reading "7926" hung on the front exterior, right next to the door where Mr. Jackson exited and stood with his hands in the air and right next to where DOES 1-15 had their guns pointed; (ii) Mr. and Dr. Jackson's street address – 7926 – was also clearly spray painted on the sidewalk in front of their home, where the City of Los Angeles customarily spray paints house numbers; and (iii) the street sign stating "Kentwood Avenue" was directly in front of their home, right under a bright street light.

37. Moreover, DOES 1-15, who had surrounded Plaintiffs' home, had a clear view of the inside of Plaintiffs' home and could see three pajama-clad individuals, including a child, settling in to watch television. Nothing about this scene could plausibly have appeared to constitute a burglary-in-progress.

38. Nevertheless, DOES 1-15 kept their guns trained on Mr. Jackson, continuing to shout orders. Mr. Jackson complied with every order. At least fifteen (15) minutes, and perhaps significantly more, passed while the Jacksons were held hostage, in fear for their lives. To the Jacksons, it was an eternity in a terrifying life-or-death situation.

39. Finally, and without any apology, DOES 1-15 left the Jacksons' home.

40. Mr. Jackson, Dr. Jackson, and young T.J. were left terrorized.

41. T.J. hid under her covers and cried hysterically all night. She suffered many more sleepless nights after the incident and continues to feel unsafe in their home, often refusing to go into the back den by herself.

42. Dr. Jackson cried uncontrollably for the rest of the night, suffered many subsequent sleepless nights, and has experienced panic attacks and significant weight gain since this incident. A veterinarian and the President and CEO of Airport Cities Animal Hospital, Inc., Dr. Jackson was unable to work in the days after the incident. It has continued to impact her professional engagements.

43. Mr. Jackson suffered, and continues to suffer, tremendous emotional distress as well. He feared for his own life, and he feared for the lives of his wife and young daughter.

44. The day after Christmas, Mr. Jackson went to the LAPD Pacific Division to report the incident and get an explanation for why the LAPD had so clearly violated his rights. Shockingly, he was told that the LAPD did not have a report of any LAPD officers having gone to Plaintiffs' home. Mr. Jackson was told that LAPD officers had responded to a burglary-in-progress on another street in the Jacksons' neighborhood, but that the reports indicated the LAPD officers had gone directly there, arrived on time, and completed their investigation with no incident.

45. That information was plainly false, and Mr. Jackson told that to the LAPD officer. The officer said he would follow up with Mr. Jackson. No one at the LAPD ever followed up with him.

46. Between January and May 2018, Mr. Jackson made repeated calls to the LAPD to find out what was going on, why the incident had happened, and what

the LAPD was going to do to ensure that no other innocent civilian was subjected to what he and his family had gone through.

47. After receiving no response for months, Mr. Jackson was finally told on May 8, 2018, that DOES 16-20 had reviewed what had transpired at the Jackson family home and found no evidence of any wrongdoing on behalf of the officers (DOES 1-15).

48. On information and belief, this reflects a long-standing pattern within the Los Angeles Police Department whereby sham investigations are conducted into credible allegations of wrongdoing and LAPD officers are acquitted of any misconduct.

49. This also reflects a long-standing practice within the Los Angeles Police Department to look the other way when officers engage in misconduct, sometimes going so far as to falsify and fabricate evidence in order to exonerate the accused officers or provide a justification for what might otherwise be considered misconduct.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

50. On June 22, 2018, Plaintiffs timely filed state tort claims with the Defendant City of Los Angeles pursuant to California Government Code § 910 *et seq*. On September 27, 2018, Defendant City denied those claims.

## LEGAL CLAIMS

### FIRST CAUSE OF ACTION:
### 42 U.S.C. § 1983 – Excessive Force
### (Against All Defendants)

51. Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

52. DOES 1-20 violated Plaintiffs' rights to be free from excessive or arbitrary force without reasonable or probable cause under the Fourth Amendment to the United States Constitution.

53. As a result of the DOE Defendants' unlawful conduct, Plaintiffs suffered severe physical and emotional distress.

54. The DOE Defendants were acting at all relevant times under color of state law as an agent of the City of Los Angeles.

55. The DOE Defendants knew or should have known that using excessive force against Plaintiffs without reasonable or probable cause was a clearly established violation of the Fourth Amendment at the time of the incident.

56. The DOE Defendants acted with malice and oppression and with a conscious disregard of Plaintiffs' rights, making Defendant City and Defendants DOE 1-20 liable for punitive damages under California Civil Code § 3294.

## SECOND CAUSE OF ACTION:
## 42 U.S.C. § 1983 – Unlawful Seizure
### (Against All Defendants)

57. Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

58. As described in greater detail above, DOES 1-15 intentionally restrained Plaintiffs' liberty through a showing of tremendous physical force and showing of authority. That seizure was unreasonable and violated Plaintiffs' Fourth Amendment rights.

59. The DOE Defendants were acting at all relevant times under color of state law as an agent of the City of Los Angeles.

60. The DOE Defendants knew or should have known that their conduct constituted an unlawful seizure of Plaintiffs in violation of the Fourth Amendment at the time of the incident.

61. The DOE Defendants acted with malice and oppression and with a conscious disregard of Plaintiffs' rights, making Defendant City and Defendants DOE 1-20 liable for punitive damages under California Civil Code § 3294.

### THIRD CAUSE OF ACTION:
### 42 U.S.C. § 1983 – Unlawful Entry
### (Against All Defendants)

62. Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

63. As described in greater detail above, DOES 1-15 physically entered the Jacksons' property without a warrant. That entry was unreasonable and violated Plaintiffs' Fourth Amendment rights.

64. The DOE Defendants were acting at all relevant times under color of state law as an agent of the City of Los Angeles.

65. The DOE Defendants knew or should have known that their conduct constituted an unlawful entry in violation of Plaintiffs' rights under the Fourth Amendment at the time of the incident.

66. The DOE Defendants acted with malice and oppression and with a conscious disregard of Plaintiffs' rights, making Defendant City and Defendants DOE 1-20 liable for punitive damages under California Civil Code § 3294.

### FOURTH CAUSE OF ACTION:
### 42 U.S.C. § 1983 – Failure to Intervene
### (Against All Defendants)

67. Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

68. In the manner described above, one or more of the DOE Defendants had a realistic opportunity to prevent the violations of Plaintiffs' constitutional rights but failed to do so.

69. The DOE Defendants' actions were undertaken with a reckless or callous indifference to Plaintiffs' rights.

70. As a result of the Defendants' misconduct described in this claim, Plaintiffs have suffered economic and non-economic injuries.

71. The DOE Defendants knew or should have known that their failure to intervene in the violation of Plaintiffs' rights under the Fourth Amendment was unlawful and constituted an independent constitutional violation at the time of the incident.

72. The DOE Defendants acted with malice and oppression and with a conscious disregard of Plaintiffs' rights, making Defendant City and Defendants DOE 1-20 liable for punitive damages under California Civil Code § 3294.

**FIFTH CAUSE OF ACTION:**
**42 U.S.C. § 1983 –** *Monell* **Claim**
**(Against Defendant City of Los Angeles)**

73. Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

74. Under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), Defendant City of Los Angeles is liable for all injuries sustained by Plaintiffs as set forth herein. The City bears liability because its policies, practices and/or customs were the driving force behind Plaintiffs' injuries. The City and its officials maintained or permitted one or more of the following policies, customs or practices:

    a. Failure to provide adequate training and supervision to its police officers, employees and/or agents with respect to constitutional limits on the use of excessive and deadly force;

    b. Failure to provide adequate training and supervision to its police officers, employees and/or agents with respect to constitutional limits on the seizure of civilians;

    c. Failure to provide adequate training and supervision to its police officers, employees and/or agents with respect to constitutional limits on the entry onto civilians' property;

d. Failure to adequately discipline or retrain officers involved in misconduct;

e. Condonation and encouragement of officers in the belief that they can violate the rights of persons, such as Plaintiffs, with impunity, and that such conduct will not adversely affect their opportunities for promotion and other employment benefits.

75. The City is also liable for the actions of the DOE Defendants under *Monell* because it ratified the officers' misconduct and concluded that no wrongdoing had occurred. Specifically, Plaintiffs allege that:

a. DOES 1-20 acted under color of state law;

b. The actions of DOES 1-19 deprived Plaintiffs of their rights under the U.S. Constitution, as described in greater detail in Plaintiffs' First, Second, Third, and Fourth Causes of Action;

c. DOE 20 was a final policymaker and acted under color of state law;

d. DOE 20 had final policymaking authority from Defendant City of Los Angeles concerning DOES 1-19's actions; and

**e.** DOE 20 ratified DOES 1-19's actions and conclusions – that is, DOE 20 knew of and made a deliberate choice to approve DOES 1-19's actions and their bases for it.

**SIXTH CAUSE OF ACTION:**
**State Law Claim – Assault**
**(Against All Defendants)**

76. Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

77. Without consent or legal privilege, DOES 1-20 created a reasonable apprehension in Plaintiffs of immediate harmful or offensive contact.

78. As a result of the aforementioned conduct, Plaintiffs were placed in fear for their physical safety and lives and suffered physical and psychological damages.

79. The DOE Defendants were acting at all relevant times under color of state law and within the scope of their employment as an agent of the City of Los Angeles. Defendant City is responsible for the wrongful conduct of its employees under the law of vicarious liability, including the doctrine of respondeat superior.

80. The DOE Defendants acted with malice and oppression and with a conscious disregard of Plaintiffs' rights, making Defendant City and DOES 1-20 liable for punitive damages under California Civil Code § 3294.

### SEVENTH CAUSE OF ACTION:
### State Law Claim – False Imprisonment
### (Against All Defendants)

81. Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

82. DOES 1-15 intentionally confined Plaintiffs without their consent, without lawful privilege, and for an appreciable period of time.

83. As a result of the aforementioned conduct, Plaintiffs were placed in fear for their physical safety and lives and suffered physical and psychological damages.

84. The DOE Defendants were acting at all relevant times under color of state law and within the scope of their employment as an agent of the City of Los Angeles. Defendant City is responsible for the wrongful conduct of its employees under the law of vicarious liability, including the doctrine of respondeat superior.

85. The DOE Defendants acted with malice and oppression and with a conscious disregard of Plaintiffs' rights, making Defendant City and DOES 1-20 liable for punitive damages under California Civil Code § 3294.

## EIGHTH CAUSE OF ACTION:
### State Law Claim – Intentional Infliction of Emotional Distress
### (Against All Defendants)

86. Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

87. DOES 1-20 engaged in extreme and outrageous conduct that transcended the bounds of human decency.

88. The DOE Defendants intended to cause, and did cause, Plaintiffs to experience severe emotional distress and they each acted with reckless disregard of the probability that Plaintiffs would suffer such injuries.

89. The DOE Defendants' conduct was a substantial factor in causing Plaintiffs' severe distress.

90. The DOE Defendants were acting at all relevant times under color of state law and within the scope of their employment as an agent of the City of Los Angeles. Defendant City is responsible for the wrongful conduct of its employees under the law of vicarious liability, including the doctrine of respondeat superior.

91. The DOE Defendants acted with malice and oppression and with a conscious disregard of Plaintiffs' rights, making Defendant City and DOES 1-20 liable for punitive damages under California Civil Code § 3294.

## NINTH CAUSE OF ACTION:
### State Law Claim – Negligence
### (Against All Defendants)

92. Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

93. DOES 1-20 owed a duty of care toward Plaintiffs and were required to use reasonable diligence to ensure Plaintiffs' safety. The DOE Defendants' actions and omissions, including their unlawful entry onto Plaintiffs' property, their failure to properly assess the need to use force against Plaintiffs, and their subsequent cover-up of their misconduct, were negligent and reckless.

94. As a result of Defendants' unlawful conduct, Plaintiffs suffered severe damages, including emotional distress.

95. The DOE Defendants were acting at all relevant times under color of state law and within the scope of their employment as an agent of the City of Los Angeles. Defendant City is responsible for the wrongful conduct of its employees under the law of vicarious liability, including the doctrine of respondeat superior.

96. The DOE Defendants acted with malice and oppression and with a conscious disregard of Plaintiffs' rights, making Defendant City and DOES 1-20 liable for punitive damages under California Civil Code § 3294.

## TENTH CAUSE OF ACTION:
### Bane Act – Cal. Civil Code § 52.1
### (Against All Defendants)

97. Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

98. DOES 1-20, by their conduct, interfered by threats, intimidation, or coercion, or attempted to interfere by threats, intimidation, or coercion, with the exercise or enjoyment of Plaintiffs' rights as secured by the Fourth Amendment to the United States Constitution or laws of the United States.

99. There was no lawful justification for the DOE Defendants to threaten, intimidate, or coerce Plaintiffs, or to attempt to use threats, intimidation, or coercion to interfere with Plaintiffs' rights.

100. As a result of the DOE Defendants' unlawful conduct, Plaintiffs suffered severe emotional distress.

101. The DOE Defendants acted with malice and oppression and with a conscious disregard of Plaintiffs' rights, making Defendant City and DOES 1-20 liable for punitive damages under California Civil Code § 3294.

## **PRAYER FOR RELIEF**

Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

**WHEREFORE**, Plaintiffs pray as follows:

1. For general and specific damages to Plaintiffs in an amount to be determined according to proof at trial;

2. For an award of punitive and exemplary damages against Defendant City of Los Angeles and Defendants DOE 1-20 in an amount to be determined according to proof at trial;

3. For an award of statutory damages and penalties pursuant to California Civil Code section 52.1(h) and California Code of Civil Procedure section 1021.5;

4. For reasonable attorneys' fees and costs as provided by law;

5. For such other and further relief as the Court deems just and proper.

Respectfully submitted,

LAW OFFICE OF RACHEL STEINBACK

By: /s/ Rachel Steinback
*Attorneys for Plaintiffs*

17
COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand that a trial by jury be conducted with respect to all issues and claims triable by a jury.

Dated: March 26, 2019

                        LAW OFFICE OF RACHEL STEINBACK

                        By: /s/ Rachel Steinback
                        *Attorney for Plaintiffs*